```
------------------------------x
                              :
ANTECH DIAGNOSTICS, INC.      :   Civ. No. 3:16CV00481(AWT)
                              :
v.                            :
                              :
VETERINARY ONCOLOGY AND       :
HEMATOLOGY CENTER, LLC, and   :
GERALD POST                   :
                              :
------------------------------x
------------------------------x
                              :
VETERINARY ONCOLOGY AND       :
HEMATOLOGY CENTER, LLC, and   :
GERALD POST                   :
                              :
v.                            :
                              :
VCA, INC., VCA ANIMAL         :
HOSPITALS, INC., and MANHATTAN:
VETERINARY GROUP, P.C.        :
                              :   May 17, 2018
------------------------------x
```

## RULING ON MOTION TO COMPEL [Doc. #171]

Plaintiff Antech Diagnostics, Inc. ("Antech"), and third party defendants VCA, Inc. ("VCA"), VCA Animal Hospitals, Inc. ("VCAAH"), and Manhattan Veterinary Group, P.C. ("MVG") (Antech, VCA, VCAAH, and MVH are hereinafter sometimes collectively referred to as the "VCA parties") have filed a Motion to Compel Documents Contained on Defendants' Privilege Log [Doc. #171]. On February 14, 2018, Judge Alvin W. Thompson referred the motion to compel to the undersigned. [Doc. #173]. Defendants and third party plaintiffs Veterinary Oncology and Hematology Center, LLC

d/b/a The Veterinary Cancer Center ("VCC") and Dr. Gerald Post ("Dr. Post") (VCC and Dr. Post are hereinafter sometimes collectively referred to as the "VCC parties") have filed a response in opposition to the VCA parties' motion to compel. [Doc. #174]. As will be discussed below, the parties submitted additional cross-briefing on two issues relating to the VCC parties' claims of privilege. See Docs. #195, #196, #202, #203. After considering the parties' written submissions, as well as conducting an in camera review of certain emails withheld on the grounds of the attorney-client privilege, the Court **GRANTS** plaintiff's Motion to Compel Documents Contained on Defendants' Privilege Log [**Doc. #171**], as limited by the parties' cross briefing [Docs. #195, #196, #202, #203].

## A.    BACKGROUND

The Court presumes familiarity with the general procedural and factual background of this matter, and outlines the procedural history only as relevant to the current dispute.

On February 12, 2018, the VCA parties filed a motion to compel the production of all documents identified on the VCC parties' privilege log. [Doc. #171]. In that motion, the VCA parties sought to compel production of each document listed in the VCC parties' privilege log because that log allegedly did not comply with the Federal or Local Rules of Civil Procedure. See generally id. at 1-2. The VCA parties also contended that

many of the documents claimed as privileged are not, and that the VCC parties had failed to meet their burden of establishing privilege. See generally id. at 2, 16-21. On March 5, 2018, the VCC parties filed a memorandum in opposition to the motion to compel. [Doc. #174]. In addition to responding to the substance of the motion, the VCC parties contended that the VCA parties had failed to complete the meet and confer process as required by Local Rule 37. See id. at 4-7.

Upon review of the VCC parties' response, the Court entered an Order on March 6, 2018, requiring counsel to meet and confer, in person, on or before March 16, 2018. See Doc. #175. The Court further ordered that on or before the close of business on March 21, 2018, counsel file a joint status report identifying any issues remaining for Court intervention. See id.

On March 21, 2018, the parties filed the joint status report as directed, along with a request to submit additional briefing. [Doc. #184]. The parties reported that they had successfully resolved many of the issues raised in the motion to compel and that the VCC parties had submitted a revised privilege log. See id. at 2. The parties further represented that only two issues remained for the Court's consideration: (1) "whether inclusion of registered investment advisors ... on [certain] documents and communications vitiates and/or otherwise results in a waiver of the attorney-client privilege[;]" and (2)

"whether the marital communications privilege applies to ...
[certain] documents ... [which] were authored before Mr.
Duchemin and Dr. Post were married." Id. In light of the
narrowed issues presented, and the "importance" of those issues,
the parties requested permission to submit additional briefing,
and proposed a briefing schedule. Id.

On March 22, 2018, the Court granted the parties' request
to submit additional briefing on the two issues identified in
the parties' joint status report. See Doc. #185. The Court
adopted the parties' proposed briefing schedule, and ordered
that opening cross briefs be filed on or before April 13, 2018,
and that cross response briefs be filed on or before April 27,
2018. See id. As directed, the parties filed their cross opening
briefs on April 13, 2018, [Docs. #195, #196], and cross
responses on April 27, 2018 [Docs. #202, #203].

On April 26, 2018, the Court ordered that the VCC parties
submit for the Court's in camera review the thirteen emails
listed on pages 4 and 5 of the VCA parties' opening brief. See
Doc. #201. The Court received those documents by email on April
27, 2018.

Before turning to the instant dispute, the Court first
considers the law applicable to the claims of privilege.

**B.    LAW OF FORUM TO BE APPLIED**

Antech brings this breach of contract action in federal court based on diversity jurisdiction. See generally Doc. #1. "[I]n a diversity case, the issue of privilege is to be governed by the substantive law of the forum state[.]" Dixon v. 80 Pine St. Corp., 516 F.2d 1278, 1280 (2d Cir. 1975); accord Application of Am. Tobacco Co., 880 F.2d 1520, 1527 (2d Cir. 1989); see also Safeco Ins. Co. of Am. v. Vecsey, 259 F.R.D. 23, 27–28 (D. Conn. 2009) ("Where, as here, a federal court's subject-matter jurisdiction is premised on diversity of citizenship, the court must apply state law to privilege issues." (footnote, citation, and internal quotation marks omitted)).

The parties do not appear to dispute that Connecticut law applies to the issues of privilege now before the Court. See Doc. #195at 5-6, n.2; Doc. #196 at 4-5. Nevertheless, the Court notes that the VCC parties have filed an amended counterclaim and third-party complaint against the VCA parties. See Doc. #138. That pleading alleges subject matter jurisdiction arising from both diversity of citizenship and the existence of a federal question. See id. at 6. Of the fourteen counts brought, one alleges a federal claim – specifically, a violation of the Sherman Act. See id. at 29-31. Each of the other thirteen counts alleges a state law claim. See generally Doc. #138.

"A counterclaim that raises a federal question will ... bring a
case within the purview of federal privilege law." Baker's Aid,
a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., No.
87CV0937(JMM), 1988 WL 138254, at *3 (E.D.N.Y. Dec. 19, 1988).
However, "to determine whether federal common law or the
Connecticut state statute applies to the privilege asserted ...
a district court in a federal proceeding must examine the claims
for which the discovery is sought and the basis for the Court's
jurisdiction." Tavares v. Lawrence & Mem'l Hosp., No.
3:11CV770(CSH), 2012 WL 4321961, at *5 (D. Conn. Sept. 20,
2012).

Here, it does not appear that the discovery in dispute
relates to the Sherman Act claim. That claim alleges that "VCA
has a dominant and near or actual monopolistic position in the
relevant geographic and services market[,]" and has "unlawfully
directed the hospitals it owned or controlled in Connecticut
refused to deal with VCC." Doc. #138 at 30 (sic). The parties do
not connect their arguments as to the privilege issues to this
claim in any way.

Accordingly, and in light of the parties' apparent
consensus that Connecticut law applies to the present dispute,
the Court will apply Connecticut law to the claims of privilege
asserted by the VCC parties. See also Fed. R. Evid. 501 ("[I]n a

civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.").[1]

## C.    DISCUSSION

The VCA parties ask the Court to compel the production of communications between two categories of persons: First, between the VCC parties, their attorneys, and their financial advisors; and second, between Dr. Post and his now husband, David Duchemin. See generally Docs. #171, #195, #203. The VCC parties vigorously oppose the motion to compel, and maintain that valid privileges protect the communications from disclosure. See generally Docs. #174, #196, #202.

### 1. Inclusion of Third Parties on Attorney-Client Communications

Before turning to the parties' substantive arguments, the Court first reviews the general principles applicable to claims of the attorney-client privilege in Connecticut.

#### a. Attorney-Client Privilege, Generally

"As a general rule, communications between client and attorney are privileged when made in confidence for the purpose of seeking legal advice." Blumenthal v. Kimber Mfg., Inc., 826 A.2d 1088, 1095 (Conn. 2003) (citation omitted). "In Connecticut, the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting

---

[1] The Court does not opine as to what law will ultimately apply to the merits and disposition of this action.

in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice." <u>Olson v. Accessory Controls & Equip. Corp.</u>, 757 A.2d 14, 22 (Conn. 2000) (citation omitted). "To invoke the attorney-client privilege, a communication must satisfy four criteria: (1) the attorney participating in the communication must be acting in a professional capacity as an attorney; (2) the communication must be between the attorney and the client; (3) the communication must be for the purpose of providing legal advice; and (4) the communication must be made in confidence." <u>Kent Literary Club v. Wesleyan Univ.</u>, No. CV-15-6013185, 2016 WL 2602274, at *2 (Conn. Super. Ct. Apr. 12, 2016).

"[S]ince the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." <u>Shew v. Freedom of Info. Comm'n</u>, 714 A.2d 664, 670 (Conn. 1998). "[T]he privilege is strictly construed." <u>PSE Consulting, Inc. v. Frank Mercede and Sons, Inc.</u>, 838 A.2d 135, 167 (Conn. 2004).

"The burden of proving each element of the privilege, by a fair preponderance of the evidence, rests with the [party] seeking to assert it." <u>Blumenthal</u>, 826 A.2d at 1096; <u>see also State v. Hanna</u>, 191 A.2d 124, 130 (Conn. 1963) ("The burden of proving the facts essential to the privilege is on the person

asserting it."). "That burden is discharged by the presentation of evidence in the form of testimony or affidavit concerning the document's content and use." <u>Babcock v. Bridgeport Hosp.</u>, 742 A.2d 322, 355 (Conn. 1999).[2]

### b. Inclusion of Third Parties on Attorney-Client Communications

Although the Connecticut Supreme Court has "acknowledged that statements made in the presence of a third party are usually not privileged because there is then no reasonable expectation of confidentiality[, it] ha[s] recognized that the presence of certain third parties who are agents or employees of an attorney or client, and who are <u>necessary to the consultation</u>, will not destroy the confidential nature of the communications." <u>Olson</u>, 757 A.2d at 22 (emphasis added) (internal citations and quotation marks omitted); <u>accord</u> <u>Leone v. Fisher</u>, No. 3:05CV521(CFD)(TPS), 2006 WL 2982145, at *5 (D. Conn. Oct. 18, 2006) ("Connecticut courts also require necessity, noting that, the presence of certain third parties ... who are agents or employees of an attorney or client, and <u>who are necessary to the consultation</u>, will not destroy the confidential nature of the communications." (citation omitted)).

---

[2] A "preponderance of the evidence" has been defined as "the better evidence, the evidence having the greater weight, the more convincing force in your mind." <u>Cross v. Huttenlocher</u>, 440 A.2d 952, 955 (Conn. 1981).

Said another way, "[t]he presence of third parties generally destroys the confidentiality of a communication, precluding a claim of privilege. This rule does not apply, however, when the presence of the third parties is required to achieve the purpose of the communication." State v. Mark R., 17 A.3d 1, 7 (Conn. 2011).

### c. Summary of Arguments

The VCA parties contend that the Court should compel the VCC parties to produce any alleged attorney-client communication that has been disclosed to third parties. See Doc. #171-1 at 20-21. Specifically, the VCA parties assert that several attorney-client communications were also sent to the VCC parties' financial advisors, thereby vitiating any attorney-client privilege. See id. at 21. The VCC parties respond: "The very nature of the relationship between an individual and their financial advisor warrants the inference that the parties intended for the communications to remain confidential, just as they intended their attorney-client communications to remain confidential. Moreover, the financial advisors were included in the context of seeking legal advice." Doc. #174 at 21.[3]

---

[3] Included an as exhibit to the VCC parties' opposition is the Affidavit of Attorney Erin C. O'Leary. See Doc. #174-1. In that affidavit, Attorney O'Leary identifies the third parties on the communications now here at issue:

The parties expand upon these arguments in their opening cross briefs. The VCA parties contend that the "inclusion of Bill Loftus and Sarah Simon on [thirteen identified] documents and communications waives or vitiates the privilege absent a showing that their presence on these communications was necessary to the provision of legal advice." Doc. #195 at 5. In that regard, the VCA parties assert that the VCC parties have failed to meet their burden of establishing that: "1) William Loftus and Sarah Simon were agents of the VCC Parties or their legal counsel; 2) the purpose of the challenged communications was primarily for legal – as opposed to business – purposes; and 3) William Loftus' and Sarah Simon's involvement in the challenged communications was <u>necessary</u> to that legal consultation or advice." <u>Id.</u> at 7-8. By contrast, the VCC parties contend that Mr. Loftus and Ms. Simon are their fiduciaries, and they thus had a reasonable expectation of

---

a. Jim Randel is an attorney who has previously represented VCC.

b. Stephen Aronson is an attorney with the firm of Robinson & Cole who has represented VCC from time to time.

c. Sarah Simon and Bill Loftus are financial advisors to VCC, DR. Post, and Dr. Post's husband and former VCC employee David Duchemin.

<u>Id.</u> at ¶9. Attorney O'Leary moved to withdraw from this matter on March 15, 2018. [Doc. #182]. Judge Thompson granted that motion on March 20, 2018. [Doc. #186].

confidentiality in the communications. See Doc. #196 at 10. The VCC parties also generally assert that the "knowledge possessed" by financial advisors, like Mr. Loftus and Ms. Simon, "and communicated to the lawyers impacts many decisions relevant to the litigation and the rendering of legal advice[,]" including "whether their clients can sustain a lawsuit, how much it would cost to defend a lawsuit, how the lawsuit will be financed, and how it will impact other transactions or aspects of that client's portfolio." Id. at 11.

In response, the VCA parties maintain that the VCC parties have failed to meet their burden of establishing that the inclusion of Mr. Loftus or Ms. Simon was necessary to the provision of legal advice. See Doc. #203 at 10. The VCC parties reiterate that because Mr. Loftus and Ms. Simon are their fiduciaries, the VCC parties had a reasonable expectation of confidentiality in their communications with them. See Doc. #202 at 3. The VCC parties also generally assert that financial advisors like Mr. Loftus and Ms. Simon "have a comprehensive understanding of their clients' entire financial portfolio, information that lawyers simply do not have, and information that is crucial to a lawyer's ability to provide comprehensive and informed legal advice." Id. at 2.

### d. *In Camera* Review & Analysis

The Court has reviewed the parties' written submissions, as well as the thirteen documents submitted for in camera review. For the reasons articulated below, the Court finds that each of the documents reviewed in camera is not protected by the attorney-client privilege.

The Court's ruling does not depend on whether attorney Jim Randel was engaged in an attorney-client relationship with the VCC parties at the time of the communications. However, for the purposes of this ruling, the Court assumes that he was. The Court finds this assumption reasonable based on its review of the documents submitted for in camera review and the averment of counsel that Attorney Randel "is an attorney who has previously represented VCC." Doc. #174-1 at ¶9. See DiStefano v. Milardo, 886 A.2d 415, 419 (Conn. 2005) ("An attorney-client relationship is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession." (quoting Somma v. Gracey, 544 A.2d 668 (1988))). "The burden of establishing an attorney-client relationship is on the party claiming the existence of such a relationship." Id. Were it not for information revealed in camera, the Court would be hard pressed to find an attorney-client relationship between the VCC parties and Attorney Randall based on the vague assertion in Attorney O'Leary's affidavit. Indeed, there is no attestation

that Attorney Randel was engaged in the provision of legal services for the VCC parties <u>at the time of the communications at issue</u>. Nor is there any averment that there was a retainer agreement or other contract between Attorney Randel and the VCC parties. <u>See</u> <u>id.</u> ("Evidence of either a retainer agreement or a contract between the parties is relevant to the determination of its existence."). Regardless, for purposes of this ruling only, the Court assumes that the element of an attorney-client relationship has been established.

The Court's review of the challenged communications suggests that their primary purpose was to obtain and/or provide legal advice. Again, however, the Court notes that there is no affidavit or testamentary evidence before the Court to support such a finding.

The Court also presumes, based on the declaration of Dr. Post,[4] that the communications between the VCC parties, Attorney Randel, Mr. Loftus and Ms. Simon were intended to be kept confidential. <u>See</u> Doc. #196-1 at ¶13 ("We know that anything we tell [Mr. Loftus and Ms. Simon] will be kept strictly confidential."). However, the Court's inquiry does not hinge on the confidentiality of the communications, despite the VCC

---

[4] The declaration purports to be a joint declaration of Dr. Post and his husband, David Duchemin. <u>See</u> Doc. #196-1. The declaration, however, is only signed by Dr. Post. <u>See</u> <u>id.</u> at 4. A signature page for Mr. Duchemin has not been filed.

parties' focus on that point. Rather, whether the Court finds these communications to be protected by the attorney-client privilege turns on whether or not the inclusion of Mr. Loftus and Ms. Simon on the communications was necessary to the consultation, or was otherwise required to achieve the purpose of the communications. See Olson, 757 A.2d at 22; Mark R., 17 A.3d at 7.

Based on the record before it, the Court does not find that the inclusion of Mr. Loftus and Ms. Simon on the subject communications was necessary to the consultation, or was otherwise required to achieve the purpose of the communications. The VCC parties have failed to sustain their burden on that point. The only evidence arguably relevant to the issue of necessity is the statement in the declaration of Dr. Post that he and Mr. Duchemin "would typically include [Mr. Loftus and Ms. Simon] in any discussion of significance, particularly where, as here, a lawsuit was threatened or filed against us by Antech." Doc. #196-1 at ¶14. Indeed, in their initial response to the motion to compel, the VCC parties do not assert that Mr. Loftus and Ms. Simon were necessary to the consultation, contending only that these individuals "were included in the context of seeking legal advice." Doc. #174 at 21.

The VCC parties have not established that the inclusion of Mr. Loftus and Ms. Simon specifically was necessary to the

consultation, or was otherwise required to achieve the purpose of the subject communications. Rather, the VCC parties' cross briefing discusses investment advisor representatives ("IARs") generally, and how their knowledge generally impacts "decisions relevant to the litigation and the rendering of legal advice." Doc. #196 at 11; see also Doc. #202 at 2. The VCC parties merely state that the knowledge of an IAR "influences whether their clients can sustain a lawsuit, how much it would cost to defend a lawsuit, how the lawsuit will be financed, and how it will impact other transactions or aspects of that client's portfolio." Doc. #196 at 11.

There is no evidence to support a finding that Mr. Loftus and Ms. Simon were included on the subject communications for the purposes generally attributed to IARs by the VCC parties in their briefing. There is no suggestion that here, the knowledge of Mr. Loftus and Ms. Simon impacted any legal advice obtained in this matter, or that they served as financial "interpreters" for Attorney Randel. Cf. Calvin Klein Trademark Tr. v. Wachner, 124 F. Supp. 2d 207, 209 (S.D.N.Y. 2000) (applying attorney-client privilege to communications that included an investment banker where that banker served "an interpretive function" by providing an "assessment of which facts were 'material' from a business person's perspective").

Additionally, a review of the communications at issue does not reflect any specific statements concerning the economic realities of financing the instant litigation. Nevertheless, even if they had, the Court would be inclined to find that considerations of whether a client can financially sustain a lawsuit and the impact of that lawsuit on the client's portfolio, would implicate primarily business, as opposed to legal advice.

Turning back to the review of the communications, when considered both individually and collectively, the contents of those communications do not support a finding that the inclusion of Mr. Loftus and Ms. Simon was necessary to the consultation, or was otherwise required to achieve the purpose of the communication. Although Ms. Simon is included on each of the communications, she provides no input whatsoever. The responses of Mr. Loftus merely state that he will "chat about next steps" with Dr. Post and Attorney Randel, Bates No. 1164, and that if a litigator is required, he has "a good one." Bates No. 1174. The emails also do not include legal advice from counsel to clients. The two emails in which Attorney Randel does provide some general legal advice do not suggest that the inclusion of Mr. Loftus and Ms. Simon in the discussions was in any way necessary for the rendering of that advice.

The VCC parties primarily rely on Second Circuit case law in support of their arguments that the subject communications should be found privileged. See Doc. #196 at 9-10; Doc. #202 at 2. The VCC parties contend that "the law takes a broader view of legal advice" than requiring "a showing that the presence of Loftus and Simon on the communications was necessary to the provision of legal advice." Doc. #202 at 2. In support thereof, the VCC parties cite to United States v. Kovel, 296 F.2d 918 (2d Cir. 1961), and United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999), for the proposition that "the inclusion of a third-party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client." Id. As previously noted, the law of Connecticut, not the federal common law, governs the issue of privilege in this context. However, even if the federal common law controlled, the Court would reach the same result. There is no evidence that either Mr. Loftus or Ms. Simon's inclusion in the subject communications improved the comprehension of the communications between Dr. Post and Attorney Randel.

Cases from this District and within the Second Circuit run counter to the position maintained by the VCC parties: "An agent, such as a financial advisor, may have communications with an attorney that are covered by the attorney-client privilege if

the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer." Geer v. Gilman Corp., No. 3:06CV889(JBA), 2007 WL 1423752, at *2 (D. Conn. Feb. 12, 2007) (citing Urban Box Office Network, Inc. v. Interfase Managers, L.P., No. 01CV8854(LTS)(THK), 2006 WL 1004472, at *2-3 (S.D.N.Y. Apr. 18, 2006)). Again, neither the documents submitted for in camera review, nor any affidavit before the Court, establish that Mr. Loftus and Ms. Simon explained financial concepts to Attorney Randel so that he could provide effective legal advice. Contra Calvin Klein, 124 F. Supp. 2d at 209 (where client sought advice from investment banker which made it possible for attorney to render legal advice, communications were privileged).

Accordingly, the Court finds that the VCC parties have failed to sustain their burden of establishing that the thirteen emails submitted to the Court for in camera review are protected from disclosure by the attorney-client privilege. The VCC parties shall produce those documents to the VCA parties on or before the close of business on **June 11, 2018.**

## 2. **Marital Communications Privilege**

The VCA parties seek to compel the production of 26 communications between Dr. Post and his husband, Mr. Duchemin. See Doc. #195 at 10-13. Dr. Post asserts that these communications are protected by the marital communications

privilege. See Doc. #196 at 3-8. The VCA parties contend that because these communications were authored prior to the marriage of Dr. Post and Mr. Duchemin on December 20, 2013, the communications are not subject to the marital communications privilege. See Doc. #195 at 13. The VCA parties also contend that the VCC parties have failed to meet their burden of establishing that the marital communications privilege applies to the documents at issue. See generally Doc. #203 at 2-7.

The VCC parties respond that Dr. Post and Mr. Duchemin considered themselves to have been married in 1995, that the issuance of a marriage license merely afforded legal recognition to a pre-existing fact, and that authority "militates in favor of applying the privilege to the communication at issue here[.]" Doc. #196 at 5. The VCC parties also submit that "pegging the time when the privilege attaches to the date when Post and Duchemin had a marriage license perpetuates the unjust discrimination both Obergefell and Kerrigan put a stop to." Doc. #196 at 7.

Before addressing the arguments of the parties, the Court considers the general principles governing the martial communications privilege under Connecticut law.

### a. General Principles

#### i. Legalization of Same-Sex Marriage

In October of 2008, the Connecticut Supreme Court held that "under the equal protection provisions of the state constitution, our statutory scheme governing marriage cannot stand insofar as it bars same sex couples from marrying." Kerrigan v. Comm'r of Pub. Health, 957 A.2d 407, 481 (Conn. 2008). Following the Connecticut Supreme Court's decision in Kerrigan, it became the third state Supreme Court to issue a decision legalizing same-sex marriage. See Goodridge v. Dep't of Pub. Health, 798 N.E.2d 941, 968 (Mass. 2003); In re Marriage Cases, 183 P.3d 384, 453 (Cal. 2008), superseded by constitutional amendment as stated in Hollingsworth v. Perry, 570 U.S. 693 (2013). It would take another seven years for the United States Supreme Court to conclude that "the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty." Obergefell v. Hodges, 135 S. Ct. 2584, 2604-05 (2015). The United States Supreme Court ultimately held that "same-sex couples may exercise the fundamental right to marry. No longer may this liberty be denied to them[.]" Id. at 2605.

It is within this context that the Court considers the assertion of the marital communications privilege between Dr. Post and his husband, Mr. Duchemin. The Court next turns to the parameters of that privilege under Connecticut law.

### ii.  *The Marital Communications Privilege in Connecticut*

The marital communications privilege "permits an individual to refuse to testify, and to prevent a spouse or former spouse from testifying, as to any confidential communication made by the individual to the spouse during their marriage." State v. Christian, 841 A.2d 1158, 1171 (Conn. 2004), superseded by statute on other grounds as stated in State v. Bennett, 155 A.3d 188 (Conn. 2017).

> The marital communications privilege protects "information privately disclosed between husband and wife in the confidence of the marital relationship[.]" Trammel v. United States, supra, 445 U.S. at 51, quoting Stein v. Bowman, 38 U.S. 209, 223 (1839). ... "[T]he primary purpose of the confidential marital communication privilege is to foster marital relationships by encouraging confidential communication between spouses...." Curran v. Pasek, 886 P.2d 272, 276 (Wyo. 1994). The privilege "permit[s] a husband and wife to communicate freely with one another without fear that their communications will be used against them at some future date." G. Sodaro & P. Wilson, "Spousal Privileges," in 2 Testimonial Privileges (S. Stone & R. Taylor eds., 2d Ed. 1995) §5.07, p. 5–11. "We encourage married people to confide in each other by protecting their statements from later scrutiny in court." United States v. Lea, 249 F.3d 632, 641 (7th Cir. 2001).

Id. at 1172–73. Although the marital communications privilege has now been codified by the Connecticut legislature as to

criminal proceedings, see Conn. Gen. Stat. §54-84b,[5] it exists

only at common law as applicable to civil proceedings. See Li

Poa v. Stamford Hosp., No. FBT-CV-09-5027372, 2011 WL 2734481,

at *2 (Conn. Super. Ct. June 8, 2011).

Cases discussing the privilege emphasize that in order for

it to apply, the communications must have been made during a

legally valid marriage. See, e.g., Christian, 841 A.2d at 1175

("[T]he marital communications privilege was founded upon the

strong policy of preserving the marital relationship through the

fostering of confidences between spouses. This policy applies

with equal force to preserve all legally valid marriages[.]");

State v. Beavers, 963 A.2d 956, 972 n.23 (Conn. 2009) ("To be

subject to the marital communications privilege, a statement

must be: (1) a communication; (2) made during a legally

valid marriage, irrespective of difficulties; and (3)

confidential in nature."); Grasso Assocs. Fin. Planning & Ins.

Servs., Inc. v. Horvath, No. CV-12-6030337, 2015 WL 4380282, at

_____

[5] In criminal proceedings, "for a communication to be privileged
under §54-84b, the communication must be: (1) made to a spouse
during a marriage; (2) confidential; and (3) induced by the
affection, confidence, loyalty and integrity of the marital
relationship." State v. Davalloo, 128 A.3d 492, 503 (Conn.
2016). Here, the parties focus on only one element of the
privilege, namely whether the communications were made to a
spouse during a legal marriage. The Court focuses its inquiry on
that element and does not not reach the issue of whether each of
the elements applicable to the privilege in the criminal context
is also applicable to this civil litigation.

*1 (Conn. Super. Ct. June 24, 2015) ("For the marital communications privilege to apply, the communications must have been made in confidence during the marriage.").

"[A]s with all privileges, the [party] claiming the ... privilege has the burden of establishing all essential elements." Harp v. King, 835 A.2d 953, 967 (Conn. 2003). Again, the burden of proving the elements of an evidentiary privilege, such as the marital communications privilege, is by a fair preponderance of the evidence. See, e.g., Blumenthal, 826 A.2d at 1096.

### b. Analysis

The VCA parties' argument is straightforward: Because Dr. Post and Mr. Duchemin were not legally married until December 20, 2013, any communications before that date are not subject to the marital communications privilege. See Doc. #195 at 13, 15-16. The VCC parties' response is a bit more complex, and generally requests that the Court extend the privilege on public policy grounds to communications made prior to the issuance of a valid marriage license. See generally Doc. #196 at 6-8; Doc. #202 at 4-6.

The VCC parties contend that Dr. Post and Mr. Duchemin, who are Connecticut residents, have considered themselves married since 1995; they have submitted the declaration of Dr. Post in support of that assertion. See Doc. #196 at 6; see also Doc.

#196-1 at ¶2. Essentially, the VCC parties ask the Court to recognize that Dr. Post and Mr. Duchemin have been married under the common law since 1995. "Although other jurisdictions may recognize common-law marriage or accord legal consequences to informal marriage relationships. Connecticut definitely does not." McAnerney v. McAnerney, 334 A.2d 437, 441 (Conn. 1973) (footnote omitted). Thus, "although two persons cohabit and conduct themselves as a married couple, our law neither grants to nor imposes upon them marital status." Id. at 442.[6]

In that regard, although the declaration of Dr. Post states that he and Mr. Duchemin have lived together since 1995 and have held themselves out as spouses since that date, see Doc. #196-1 at ¶¶2-3,

> [m]arital status ... arises not from the simple declarations of persons nor from the undisputed claims of litigants. Perlstein v. Perlstein, 152 Conn. 152, 156, 204 A.2d 909. It is rather created and dissolved only according to law. In this jurisdiction, common-law marriages are not accorded validity; State ex rel. Felson v. Allen, 129 Conn. 427, 432, 29 A.2d 306; for our statute has been construed to require the marriage contract to be entered into before authorized persons and with certain formalities which the state has prescribed. Dennis v. Dennis, 68 Conn. 186, 196, 36 A. 34.

---

[6] There is no dispute that Dr. Post and Mr. Duchemin are Connecticut residents. That Dr. Post is a Connecticut resident is admitted by the VCC parties. See Doc. #29, Answer to Complaint, at ¶3. Although Dr. Post's declaration refers to his living in San Francisco with Mr. Duchemin, see Doc. #196-1 at ¶2, California also does not recognize common-law marriages. See People v. Badgett, 895 P.2d 877, 897 (Cal. 1995) ("California does not recognize common law marriages[.]").

<u>Hames v. Hames</u>, 316 A.2d 379, 382 (Conn. 1972).

Additionally, although Dr. Post's declaration states that he and Mr. Duchemin have considered themselves married since 1995, the VCA parties have produced evidence that undermines this claim. For example, when asked what year he and Mr. Duchemin were married, Dr. Post testified: "2013." Doc. #171-6, Deposition of Gerald Steven Post, DVM, at 180:10-14. In response to the question, "When is your anniversary?" Dr. Post simply answered, "December 20th." <u>Id.</u> at 180:15-16. There was no confusion, and no attempt to explain, the anniversary date in light of Dr. Post's purported consideration that he and Mr. Duchemin had been married since 1995. Similarly, the VCA parties have provided an email authored by Mr. Duchemin dated January 2014, which thanked a third party for her congratulations and thereafter stated: "It's so weird calling another man my husband but it is nice." Doc. #207-1 at 2.[7] This statement also undermines the assertion in Dr. Post's largely self-serving declaration that he and Mr. Duchemin have held themselves out as

---

[7] The email that contains this quotation was designated confidential by the VCC parties during discovery. <u>See</u> Doc. #204 at 1. However, the quotation relied on by the Court, and cited herein, does not contain confidential information as contemplated by the Stipulation and Order for the Production and Exchange of Confidential Information. <u>See</u> Doc. #93 at 2. The Court's reference to the cited portion of the confidential email in no way vitiates the confidentiality designation as to the remainder of that document.

spouses, "husband and husband" since 1995. Doc. #196-1 at ¶3.
Regardless, under Connecticut law, it is well-established that
for a legally valid marriage to exist, there must be a marriage
contract "with certain formalities[.]" Hames, 316 A.2d at 382.
Here, that "contract" was not entered into until December 20,
2013. Accordingly, because the marital communications privilege
attaches only to those communications made during a legally
valid marriage, and leaving aside for the moment the date on
which same-sex marriage became legal, the privilege here would
only attach to those communications made after December 20,
2013.

The VCC parties' argument, however, does not simply seek
the recognition of a common-law marriage between Dr. Post and
Mr. Duchemin. Indeed, they contend that "pegging the time when
the privilege attaches to the date when Post and Duchemin had a
marriage license perpetuates the unjust discrimination both
Obergefell and Kerrigan put a stop to." Doc. #196 at 7. The VCC
parties thus task the Court with the weighty act of invoking its
"inherent power and authority to interpret the scope of the
privilege in a manner that does justice to the fundamental
principles of justice and liberty announced in Kerrigan and
Obergefell." Id. at 8.

In support of this position, the VCC parties primarily rely
on the Connecticut Supreme Court case of Mueller v. Tepler, 95

A.3d 1011 (Conn. 2014). There, the Connecticut Supreme Court recognized a loss of consortium claim by unmarried partners in a same-sex relationship, where at the time the claim arose the partners would have been married, but for the existence of a state law barring same-sex marriage. See id. at 1023. The Court held: "We agree with Stacey's claim that this court should expand the common-law claim for loss of consortium to members of couples who were not married when the tortious conduct occurred, but who would have been married if the marriage had not been barred by state law." Id. In reaching this conclusion, the Connecticut Supreme Court considered each of the public policy factors underlying a loss of consortium claim. See id. at 1025-26. Particularly, the Court noted that "marriage cannot logically serve as a proxy for the existence of the commitment that gives rise to the existence of consortium in the first instance when marriage is not an option." Id. at 1026 (internal quotation marks and citation omitted).

Mueller is plainly distinguishable from the current facts. There, the individual in a same-sex relationship sought to assert a loss of consortium claim for a tort that occurred in 2001, some seven years before same-sex couples had a right to marry in the State of Connecticut. See id. at 1016. At the time the claim arose in Mueller, legal marriage between a same-sex couple was not an option. Here, by contrast, the VCC parties

claim privilege for communications between Dr. Post and Mr. Duchemin from 2009 to 2013. <u>See</u> Doc. #195-1 (Revised Privilege Log); <u>see also</u> Doc. #195 at 10-13 (list of challenged communications). During that time period, Dr. Post and Mr. Duchemin were able to marry in the State of Connecticut. There was no obstacle to legal marriage in this state at that time, as there was at the time the claim in <u>Mueller</u> arose. Accordingly, the holding and rationale of <u>Meuller</u> are not persuasive, nor entirely applicable, to the facts presently before the Court.

The VCC parties further contend that ruling in favor of the VCA parties' position "would result in a bewildering and unjust anomaly for gay and lesbian spouses," because it would lead to:

> (1) Post's and Duchemin's communications between 1995-2008 being protected by the marital privilege – since there was unquestionably a legal obstacle to their being married during that time period but they nevertheless held themselves out as spouses during that time period; (2) their communications between 2008-2013 not being privileged – because Connecticut permitted same sex marriage after 2008; and (3) their communications after 2013 again being protected by that privilege – because they received a marriage license and solemnized the marriage in a manner familiar to heterosexual couples.

Doc. #202 at 4-5. That argument is compelling in a general sense, but the issues it raises are not before the Court. Here, it does not appear that any communications between Dr. Post and Mr. Duchemin pre-dating 2008 are implicated. Rather, the only communications implicated in the current dispute date from 2009 to 2013. <u>See</u> Doc. #195-1 (Revised Privilege Log); <u>see also</u> Doc.

#195 at 10-13 (list of challenged communications). Additionally, the Court is not adjudicating the general rights of same-sex couples. Rather, it is constrained to consider the specific facts of the current dispute before it -- which simply does not implicate the "bewildering and unjust anomaly" suggested by the VCC parties.

Finally, the Court notes that Dr. Post has averred that he and Mr. Duchemin did not obtain a marriage license until it was legal for all same-sex couples to marry "out of solidarity with those to whom this recognition was still denied." Doc. #196-1 at ¶8. That is certainly a noble position,[8] but one that carries real legal consequences. Although the VCC parties present an emotionally compelling argument with respect to extending the marital communications privilege to a date before Dr. Post and Mr. Duchemin's legal marriage, the Court must apply the law as it stands.

Pursuant to that law, the marital communications privilege applies only to communications made during a legally valid marriage. See <u>Christian</u>, 841 A.2d at 1175; <u>see also</u> Lisa Yurwit

---

[8] The Court notes the discrepancy between the statement that Dr. Post and Mr. Duchemin delayed obtaining a marriage license "out of solidarity with those to whom this recognition was still denied[,]" Doc. #196-1 at ¶8, and the date on which marriage became legal throughout the United States. Dr. Post and Mr. Duchemin married on December 20, 2013. The Supreme Court ruled in <u>Obergefell</u> on June 26, 2015, about a year and a half <u>after</u> Dr. Post and Mr. Duchemin obtained a marriage license.

Bergstrom & W. James Denvil, <u>Availability of Spousal Privileges</u> <u>for Same-Sex Couples</u>, 11 U. Md. L.J. Race, Religion, Gender & Class 224, 226 (2011) ("One must be married, of course, to avail oneself of these evidentiary privileges. Therefore, the privileges were not available to same-sex couples in the United States until 2004, when Massachusetts first legalized same-sex marriage." (footnote omitted)). Here, Dr. Post and Mr. Duchemin were not legally married until December 20, 2013. They had the legal right, in Connecticut, to marry as early as 2008. Therefore, communications between Dr. Post and Mr. Duchemin between 2009 and December 20, 2013, are not protected by the marital communications privilege.[9]

Accordingly, the court GRANTS the VCA parties' motion to compel as to the 26 challenged communications. <u>See</u> Doc. #195 at 10-13. The VCC parties shall produce those documents to the VCA parties on or before **June 11, 2018.**

**D. CONCLUSION**

Thus, for the reasons stated, the VCA parties' Motion to Compel Documents Contained on Defendants' Privilege Log [**Doc. #171**] is **GRANTED.**

---

[9] The Court offers no opinion on whether communications that predated <u>Kerrigan</u> would be treated differently, in light of the Connecticut Supreme Court's ruling in <u>Mueller</u>.

SO ORDERED at New Haven, Connecticut this 17th day of May, 2018.

```
                          /s/
                    _____
                    HON. SARAH A. L. MERRIAM
                    UNITED STATES MAGISTRATE JUDGE
```